UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

MARY ALLEN O/B/O P.A., JR.                    CIV. ACTION NO. 3:21-01967

VERSUS                                        JUDGE TERRY A. DOUGHTY

KILOLO KIJAKAZI, ACTING                       MAG. JUDGE KAYLA D. MCCLUSKY
COMMISSIONER, U.S. SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner of Social

Security's denial of disability insurance benefits.   The appeal was referred to the undersigned

United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) and (C).

For the reasons assigned below, it is recommended that the decision of the Commissioner

be **REVERSED and REMANDED for further proceedings.**

## Background

On August 6, 2019, Mary Allen protectively filed the instant application for

Supplemental Security Income (SSI) benefits on behalf of her minor child, P.A., Jr.,[1] who was

born in May 2016.   (Tr. 30, 53, 145-151).   Allen alleged in the application that P.A., Jr. had

been disabled since February 1, 2017,[2]  because of low receptive language skills, anger, and

aggressive behavior.   (Tr. 153).   The claim was denied initially on November 22, 2019, and

---

[1]   The court will refer to the minor by his initials in accordance with Rule 5.2(a) of the Federal
Rules of Civil Procedure LR 5.82W and the E-Government Act of 2002.

[2]  At the hearing, the disability onset date was amended to the protective filing date of August 6,
2019.   (Tr. 10, 30).

again upon reconsideration on March 5, 2020.   (Tr. 51-74, 77-87).   Thereafter, Allen requested,

and received a November 30, 2020 hearing before an Administrative Law Judge ("ALJ").   (Tr.

26-50).   By written decision dated December 10, 2020, however, the ALJ determined that the

claimant was not disabled under the Act.   (Tr. 7-17).   Allen appealed the adverse decision to

the Appeals Council.   On May 7, 2021, the Appeals Council denied the request for review; thus,

the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-3).

On July 9, 2021, Allen filed the instant complaint for judicial review of the

Commissioner's final decision.   Following submission of the administrative transcript and

supporting memoranda, the matter is now before the court.

**Standard of Review**

This court's standard of review is (1) whether the final decision is supported by

substantial evidence, and (2) whether the Commissioner applied the proper legal standards to

evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The

Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative
> law to describe how courts are to review agency factfinding.   Under the substantial-
> evidence standard, a court looks to an existing administrative record and asks
> whether it contains "sufficien[t] evidence" to support the agency's factual
> determinations.   And whatever the meaning of "substantial" in other contexts, the
> threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is "more than a mere scintilla."   It means—and means only—"such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).

The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its

judgment for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994).

2

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Law

On August 22, 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105, which amended 42 U.S.C. § 1382c(a)(3). Pursuant to this law, a child under the age of eighteen is considered disabled for purposes of SSI benefits "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i) (1997).

The regulations set forth a three-step sequential evaluation process for a child seeking benefits. First, the ALJ must determine if the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924. If the child is not so engaged, then the ALJ determines whether the child has a medically determinable impairment(s) that is severe. *Id*. An impairment(s) will not be deemed severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id*. Finally, an impairment(s) that is severe also must meet, medically equal, or functionally equal a listed impairment. *Id*.

The Listing of Impairments describes impairments for each major body system that cause

3

marked and severe functional limitations.   20 C.F.R. § 416.925(a).   An impairment(s) meets a

listing when it satisfies all of the criteria of that listing, including any relevant criteria in the

introduction, and meets the duration requirement.   20 C.F.R. § 416.925(c)(3).

If an impairment(s) does not meet all of the criteria of a listing, it still can medically

equal the criteria of a listing when the claimant has other findings related to the impairment(s)

that are at least of equal medical significance to the required criteria.   *See* 20 C.F.R. §§

416.925(c)(5) & 926(b).   Medical equivalence may be appropriate in circumstances where the

claimant:   1) has an impairment described in the Listing of Impairments, but a) does not exhibit

one or more of the findings of the specified listing, or b) exhibits all of the findings, but one or

more of the findings is not as severe as specified by the listing; 2) has an impairment(s) that is

not described in the Listing of Impairments; or 3) has a combination of impairments none of

which meets a listing in the Listing of Impairments.   20 C.F.R. § 416.926(b).

Finally, if the claimant has a severe impairment(s) that does not meet or medically equal

any listing, the Commissioner will decide whether it causes limitations that *functionally* equal a

listing(s).   20 C.F.R. § 416.926a(a).   When assessing functional limitations, the Commissioner

considers all relevant factors including, but not limited to:

1)      How well [the claimant] can initiate and sustain activities, how much extra help
        [the claimant] need[s], and the effects of structured or supportive settings;

2)      How [the claimant] function[s] in school; and

3)      The effects of [the claimant's] medications or other treatment.

20 C.F.R. § 416.926a(a) (internal citations omitted).

An impairment is deemed functionally equivalent to a listed impairment if it results in an

extreme limitation in one of the following six domains of functioning or marked limitations in

two domains:   (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.   20 C.F.R. § 416.926a(a)-(b)(1).

An "extreme" limitation is assessed when the impairment(s) interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(3).   Day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities.   *Id.*   An "extreme" limitation is equivalent to standardized test scores that are at least three standard deviations below the mean.   *Id.*   "Extreme" limitation, however, does not necessarily mean a complete lack or loss of ability to function.   *Id.*

The term "marked" may be established when a claimant's impairments seriously interfere with the claimant's ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(2). "Marked" limitation also refers to a limitation that is more than "moderate," but "less than extreme."   *Id.*   A "marked" limitation is equivalent to standardized test scores that are at least two, but less than three, standard deviations below the mean.   *Id.*

### The ALJ's Decision

The ALJ determined that P.A., Jr. did not engage in substantial gainful activity during the relevant period.   (Tr. 11).   He further found that he suffered severe impairments of conduct disorder, attention deficit hyperactivity disorder ("ADHD"), speech/language impairment, communication impairment, specific development disorder of motor function, and a psychological development disorder.   *Id.*   The ALJ concluded, however, that the impairments neither met nor medically equaled a listed impairment.   (Tr. 11-12).   Accordingly, he

5

proceeded to consider whether P.A., Jr.'s impairments functionally equaled a listed impairment.

In so doing, the ALJ determined that P.A., Jr. suffered a *marked* limitation of functioning in the domain of interacting and relating to others, but a *less than marked* limitation in the remaining five domains.   (Tr. 12-16).   Because the claimant did not have at least two "marked" limitations or one "extreme" limitation of functioning, the ALJ concluded that P.A., Jr. did not have an impairment that functionally equaled any of the impairments listed in Appendix 1, Subpart P, of Regulation No. 4.   *Id.*

### Analysis

Allen's argument is succinct and targeted:   "[t]he ALJ erred by failing to build a logical bridge between the evidence and his conclusion that the child has a less than marked limitation in the functional domain of caring for himself."   (Pl. Brief, pg. 4 [doc. # 14).

In the "caring for yourself" domain, the Commissioner considers how well the claimant maintains a healthy emotional and physical state, including how well the claimant satisfies his physical and emotional wants and needs in appropriate ways; how the claimant copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area.   20 C.F.R. § 416.926a(k); *see also* Social Security Ruling 09-7p.[3]

The regulations include several age group descriptors for the caring for yourself domain. For preschool children (age 3 to attainment of age 6),[4] the regulations state that,

---

[3]   TITLE XVI: DETERMINING CHILDHOOD DISABILITY-THE FUNCTIONAL EQUIVALENCE DOMAIN OF "CARING FOR YOURSELF," ("SSR 09-7P") (Feb. 17, 2009).   Although social security rulings are not binding on the federal courts, *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), they are "binding on all components of the Social Security Administration."   20 C.F.R. § 402.35(b)(1).

[4]   In his decision, the ALJ incorrectly stated that, prior to the decision, P.A., Jr. changed age categories to "school-age child."   (Tr. 11).   This error may be redressed upon remand.   *See*

[y]ou should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to understand how to control behaviors that are not good for you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii).

The regulations also provide examples of limited functioning in the caring for yourself domain, which do not necessarily describe a "marked" or "extreme" limitation, and that are age-dependent:

(i)      You continue to place non-nutritive or inedible objects in your mouth.

(ii)     You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).

(iii)    You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.

(iv)     You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

(v)      You do not spontaneously pursue enjoyable activities or interests.

(vi)     You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3).

Allen emphasizes that the ALJ's rationale for the caring for yourself domain was remarkably brief: "records indicate claimant does not always cooperate when dressing. There are also concerning trends in the claimant's behavior regarding the safety of others. However,

---

discussion, *infra*.

considering the age of the claimant, the evidence as a whole does not suggest[ ] marked

limitations."   (Tr. 16).   Upon closer inspection, however, it is manifest that the foregoing

explanation provides no support for the ALJ's finding.   The first sentence cites evidence that the

claimant was uncooperative.   The second sentence is not relevant to the domain of caring for

yourself, and, instead, seems more suited for the domain of interacting and relating with others.

Finally, the third sentence is conclusory and simply documents the ALJ's finding.

To be sure, prior to his specific findings on functional equivalence, the ALJ included a

two-page recitation of facts from the administrative record.   (Tr. 13-16).   The ALJ also

documented the findings of the non-examining agency psychologists.[5]   *Id*.   However, the ALJ

determined that the medical consultants' opinions were only "partially persuasive" because

"additional evidence" supported a finding that P.A., Jr. had a "marked" limitation in the domain

of interacting and relating with others.   *Id*.   The additional evidence cited by the ALJ was

"consistent reports of aggressive behavior towards authority figures . . ."   (Tr. 15).

The difficulty with the ALJ's stated rationale for finding that P.A., Jr. had a marked

limitation of functioning in the domain of interacting and relating with others, is that, often on

the same occasions that P.A., Jr. was aggressive towards authority figures, he also engaged in

destructive behavior.   The following examples prove illustrative:

> On September 19, 2018, P.A., Jr. started throwing blocks around the classroom,
> kicked the library stand, and ripped a poster off the wall.   (Tr. 199).   Fifteen
> minutes later, he kicked a teacher in the leg after she told him to return to his class.

---

[5] On November 22, 2019, non-examining agency psychologist Robert McFarlain, Ph.D., and
non-examining agency physician, Susan Yoshida, M.D., reviewed the record and opined that
P.A., Jr. either had no functional limitations or that they were less than marked.   (Tr. 58-59).
   On March 4, 2020, non-examining agency psychologist Linda Upton, Ph.D., reviewed
the record and similarly concluded that P.A., Jr. either had less than marked functional
limitations or no limitation at all.   (Tr. 70-71).

(Tr. 200).

On May 7, 2019, P.A., Jr. had difficulty following directions. (Tr. 287). He kicked, threw chairs, and tried to bite the therapist. *Id*.

On May 14, 2019, P.A., Jr. hit the therapist when he did not get his way, fled from the room, and then ran into a wall when he returned. (Tr. 288).

On June 12, 2019, P.A., Jr. was assessed with moderate impairment of self-care and daily living. (Tr. 372). There was no evidence of safety concerns, suicide risk, or self-mutilation. (Tr. 375). However, he had a history of other self-harm that needed to be watched. *Id*.

On July 25, 2019, P.A., Jr. had an "extreme" emotional outburst during the last five minutes of the session because of his need to have a bowel movement, but instead of using the toilet, he kicked and screamed. (Tr. 306).

On August 1, 2019, P.A., Jr. deliberately scratched an existing bug bite and caused it to bleed. (Tr. 312).

On October 3, 2019, P.A., Jr. lay down on the ground and then hit the teacher after she picked him up off the ground. (Tr. 204). He also threw blocks, tried to pull the library shelf down, and pulled baskets on the floor. *Id*.

On November 12, 2019, Lisa Bannister, M.A., administered a speech/language evaluation. (Tr. 354-356). P.A., Jr. was attentive, cooperative, and followed directions. *Id*. However, when he was taken back to his father in the waiting room, he bit the examiner on the hand and overturned a small chair. *Id*.
On March 11, 2020, P.A. Jr. engaged in physical aggression in the form of hitting, kicking, and biting towards the lead therapist. (Tr. 515). P.A. Jr. eloped from the room and engaged in excessive physical aggression. *Id*. He also climbed on the furniture. *Id*. He was transitioned to a safe room to minimize harm to himself and the therapist. *Id*. However, he became so aggressive that he had to be sent home. *Id*.

On March 13, 2020, after 78 minutes of non-compliance, P.A., Jr. removed all of his clothes and urinated on the floor. (Tr. 520-521).

On March 18, 2020, Katie Boudloche, M.Ed., recommended that P.A., Jr. receive further examination and consultation from a psychologist. (Tr. 392-407). He was engaging in extreme physical aggression and property destruction including hitting, punching, throwing items at others, kicking, scratching, biting others, urinating, urinating on clothing and throwing it at others, and ripping wallpaper. *Id*. He was at severe risk of discontinuation of services. *Id*.

9

By July 31, 2020, Boudloche wrote that P.A., Jr. had experienced a tremendous decrease in problematic behaviors.   (Tr. 419); see also (Tr. 408-418). Nonetheless, they continued to work with him.   *Id*. at 419.

On September 28, 2020, P.A., Jr. hit with open and closed fists, pinching and scratching the therapist on the arms, hands, and neck.  (Tr. 612).  He also kicked the wall and bit wood off the door hinges.  *Id*.  Moreover, he spat and tried to stick his tongue in an electrical outlet.  *Id*.

In short, the ALJ's determination that P.A., Jr.'s behavior demonstrates a marked limitation in the domain of interacting and relating to others also seems to require a finding that P.A., Jr. had a marked limitation in the domain of caring for yourself.   Indeed, the caring for yourself domain includes an emotional component:

[c]hildren must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset. To be successful as they mature, children must also be able to cope with negative feelings and express positive feelings appropriately. In addition, after experiencing any emotion, children must be able to return to a state of emotional equilibrium. The ability to experience, use, and express emotion is often referred to as self-regulation. Children should demonstrate an increased capacity to self-regulate as they develop.

(SSR 09-7p).

A child whose impairment causes him to express frustration by destroying school materials is described as an example of an inappropriate way to regulate emotional well-being. *Id*.   Needless to say, the instant record is replete with instances of P.A., Jr. manifesting his anger and frustration in destructive and self-harmful ways.  *See* discussion, *supra*.  Clearly, this behavior is related to P.A. Jr.'s aggression towards authority figures.   Nonetheless, SSR 09-7p specifies that some impairments may cause limitations in more than one domain.   While perhaps counterintuitive, "[r]ating the limitations caused by a child's impairment(s) in each and every

10

domain that is affected is *not* 'double-weighting' of either the impairment(s) or its effects."

(SSR 09-7p) (emphasis added).   Thus, where applicable, the Commissioner will evaluate

limitations resulting from a claimant's impairments in both the domains of caring for yourself

and interacting and relating with others.   *Id*.

     Relatedly, it does not appear that the ALJ fully considered the circumstance that, because

of his impairments, P.A., Jr. was unable to attend full Head Start or Pre-K.   (Tr. 36-37).   Under

the regulations, the ALJ is obliged to consider the effects of structured or supportive settings.

*See* 20 C.F.R. § 416.924a(b)(5)(iv).   In addition, the ALJ is required to compare the claimant's

functioning with that of children his age who do not have impairments.   20 C.F.R. §

416.924a(b)(3)(i).   No such comparison appears in the ALJ's decision.

     The undersigned does not intend to imply that an ALJ commits legal error whenever he

or she fails to consider all of the factors listed in § 416.924a(b).   However, when, as here, the

claimant has an impairment that appears to cause significant limitation of functioning in a given

domain, the ALJ will need to more closely hew to the pertinent factors to support his finding that

the degree of limitation is not marked, i.e., at least two, but less than three, standard deviations

below the mean.   *See* 20 C.F.R. § 416.926a(e)(2); *Price v. Astrue*, 401 Fed. App'x. 985, 986

(5th Cir. 2010) (ALJ need not comment on every piece of evidence, but must build an accurate

and logical bridge between the evidence and the final determination).

     In this court's experience, four-year old children typically do not try to bite wood off

door hinges or stick their tongues in electrical outlets.   Whether or not this type of behavior is

consistent with a limitation that is as least two standard deviations below the norm presents an

issue that warrants further development and explanation upon remand.   In the interim, the

undersigned is constrained to find that the ALJ's determination that the claimant's impairments do not functionally equal any of the impairments listed in Appendix 1, Subpart P, of Regulation No. 4 is not supported by substantial evidence.

### Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 18th day of August, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

13